UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAUREEN GILLIS,

      Plaintiff,

v.                              Case No. 12-10734
                                    Honorable Patrick J. Duggan

WELLS FARGO BANK, N.A.,

      Defendant.
_____/

## OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND (2) DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND/OR SUMMARY JUDGMENT

On January 25, 2012, Plaintiff Maureen Gillis ("Ms. Gillis") initiated this action against Defendant Wells Fargo Bank, N.A. ("Wells Fargo") in the Circuit Court for Wayne County, Michigan. In her Complaint, Ms. Gillis alleges the following state law claims against Wells Fargo: (1) conversion; (2) fraud; (3) negligent misrepresentation; (4) innocent misrepresentation; and (5) breach of contract. Wells Fargo removed the Complaint to federal court based on diversity jurisdiction on February 17, 2012.

Presently before the Court are Ms. Gillis' motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 on December 3, 2012 (ECF No. 22) and Wells Fargo's motion for judgment on the pleadings and/or summary judgment filed pursuant to Federal Rules of Civil Procedure 12(c) and 56, respectively, on March 12, 2013. (ECF No. 40.) Ms. Gillis seeks summary judgment with respect to all of the claims in her Complaint; Wells Fargo seeks judgment with respect to her conversion and

fraud claims.  The motions have been fully briefed and the Court held a motion hearing

on May 9, 2013.  For the reasons that follow, the Court now grants in part and denies in

part Ms. Gillis' motion and denies Wells Fargo's motion.

**I.      Applicable Standards**

**A.      Federal Rule of Civil Procedure 12(c)**

A motion for judgment on the pleadings under Rule 12(c) is generally reviewed

under the same standard as a motion to dismiss pursuant to Rule 12(b)(6).  *EEOC v. J.H.*

*Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001).  Such a motion tests the legal

sufficiency of the complaint.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d

1125, 1134 (6th Cir. 1996).  "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, – , 129 S. Ct. 1937, 1949 (2009) (quoting *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 555, 570, 127 S. Ct. 1955, 1974 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

(citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).

In deciding whether the plaintiff has set forth a "plausible" claim, the court must

accept the factual allegations in the complaint as true.  *Id.*; *see also Erickson v. Pardus*,

551 U.S. 89, 127 S. Ct. 2197, 2200 (2007).  This presumption, however, is not applicable

to legal conclusions.  *Iqbal*, 129 S. Ct. at 1949.  Therefore, "[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice."

2

*Id.* (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965-65).

### B.      Federal Rule of Civil Procedure 56

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323, 106 S. Ct. at 2553.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

"A party asserting that a fact cannot be or is genuinely disputed" must designate

3

specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255, 106 S. Ct. at 2513.

## II.    Factual Background[1]

This case concerns real property located at 3424 Bishop in Detroit, Michigan ("Property").  On May 12, 2006, Ms. Gillis received a loan in the amount of $103,000.00 from Home Network Mortgage ("Home Network") to secure the Property, as reflected in a Promissory Note ("Note") signed on that date.  In exchange for the loan, Ms. Gillis granted a Mortgage on the Property to Mortgage Electronic Registration Systems, Inc. ("MERS") acting as nominee for Home Network and Home Network's successors and assigns.

The Mortgage provides that the lender may commence foreclosure proceedings against the Property if Ms. Gillis fails to make the monthly payments required under the Note.  The Mortgage required Ms. Gillis to keep the Property insured against loss by, *inter alia*, fire.  With regard to loss covered by insurance, the Mortgage reads in relevant part:

Unless Lender and Borrower otherwise agree in writing, any insurance

---

[1]The parties agree on many of the facts relevant to this action.  Therefore, the Court is not including citations to the record for every fact contained herein.

4

> proceeds, whether or not the underlying insurance was required by Lender,
> shall be applied to restoration or repair of the Property, if the restoration or
> repair is economically feasible and Lender's security is not lessened.
> During such repair and restoration period, Lender shall have the right to
> hold such insurance proceeds until Lender has had an opportunity to inspect
> such Property to ensure the work has been completed to Lender's
> satisfaction . . . If the restoration or repair is not economically feasible or
> Lender's security would be lessened, the insurance proceeds shall be
> applied to the sums secured by this Security Instrument, whether or not then
> due, with the excess, if any, paid to Borrower.

(Def.'s Resp. Ex. 2 ¶ 5.)  In accordance with the Mortgage, Ms. Gillis obtained and

maintained a homeowners insurance policy through Farmer's Insurance Group

("Farmer's").

On or about December 13, 2008, the Property caught fire.  On or around December

23, 2008, Farmer's sent a check to Ms. Gillis for $70,547.00 to cover the fire damage.

The check was payable to Ms. Gillis, Wells Fargo, and National City Home Equity.

After the fire, Ms. Gillis stopped making the monthly payments required under the

Note.  On January 16, 2009, her representative contacted Wells Fargo inquiring as to

whether Wells Fargo would discharge the Note and Mortgage in exchange for the

insurance proceeds.  Wells Fargo maintains a system that contemporaneously logs such

communications, as well as all notes related to the servicing of an account.  (Pl.'s Mot.

Ex. 2 at 6; *see also* Def.'s Resp. Ex. 5.)  According to those notes, Ms. Gillis' agent was

told that Wells Fargo does "not offer a workout option that would support that request"

and was "advised [that the mortgagor was] still responsible for the payoff [amount]."

(Def.'s Resp. Ex. 5 at WF000497.)  On February 15, 2009, Wells Fargo (which was

servicing the Note) sent a letter to Ms. Gillis, notifying her that the loan was in default and that unless she paid $2,927.59 by March 17, 2009, the loan would be accelerated.

Ms. Gillis' representative contacted Wells Fargo again on April 15, 2009, to inquire once more about using the insurance proceeds to settle the balance of Ms. Gillis' loan. (*Id*. at WF000491.)  He was again told that the insurance proceeds check could not be used to pay down the loan. (*Id*.)

On April 17, 2009, an agent in Wells Fargo's Property Loss Department sent an internal email stating:

> The homeowner is holding the insurance settlement check, but it will be stale- dated in June.  Ms. Gillis is not rebuilding her home, and wants to walk away from the property & her mortgage obligation.  She was previously denied exceptions for both a short payoff and then also principal curtailment using claim funds.  How should HIPC proceed?  Can applying the funds to the unpaid principal balance be reconsidered?

(*Id*. at WF000463.)  A response was sent the same day:

> Katie, we need to get this check from the H/O [homeowner].  She clearly has no intends [sic] on repairing the damages; which is what the insurance check should be used for.  She can not [sic] use this check to be applied to the principal balance.  Repairs need completed [sic] with these funds if there is a remaining balance we will mailed [sic] back to her and she can apply it to the loan.

(*Id*. at WF000463.)

On August 13, 2009, Wells Fargo sent an email to Fannie Mae stating that (i) there was fire damage at the Property; (ii) the homeowner received $70,547.91 in insurance proceeds; (iii) the principal balance of the loan was $99,989.42; (iv) the homeowner does not want to repair the damage; and (v) the homeowner wants to pay the loan in full. (*Id*.

6

at WF000454-55.)  A few days later, August 17, 2009, an internal email was sent to Wells

Fargo's Property Loss Department stating:

> Please contact H/O and advise her that we needs [sic] the insurance funds in
> house to go to the investor to consider a short pay off on this loan.
> R[eceived] email from hazard loss @ FNMA [Fannie Mae]: Please submit a
> Fannie Mae Form 176 to hazard loss @Fanniemae.com with your
> recommendation on how the insurance proceeds should be used.  Once
> funds are rec[eived] will fill out 176 form.

(*Id*. at WF000454.)  An August 20, 2009 entry in Wells Fargo's log provides: "Client

requests homeowner send in claim check.  Investor will not consider short sale unless

funds are recvd."  (Pl.'s Mot. Ex. 3 at WF000453.)

An August 22, 2009 entry reflects that Wells Fargo conducted a site valuation and

determinated the Property's value to be $120,202.00.  (*Id*. at WF000484.)

At some time on or before September 30, 2009, Wells Fargo employee Lauren

Copeland became involved with Ms. Gillis' account.  Ms. Copeland was assigned to the

Property Preservation Department at the time.  On October 21, 2009, Ms. Copeland sent

an internal email concerning the insurance proceeds held by Ms. Gillis:  "Property loss

has helped homeowner on claim process but the homeowner still has check.  We must

have this reissued. Sale is coming up in Dec[ember] so I will reduce bid accordingly.  Can

you reach out to Insco [insurance company] on check.  Thanks."  (*Id*. at WF000444.)

Shortly thereafter, on November 16, 2009, Ms. Gillis again inquired about a short payoff

and was advised of the documents she needed to send in for review.  (*Id*. WF000479.)

She was told, however, that there was no guarantee that it would be approved.  (*Id*.)  A

7

December 14, 2009 Wells Fargo system entry reflects that Farmer's refused to reissue a check for the insurance proceeds and indicated that, if it did, it would sent the check directly to Ms. Gillis: "This is one of many where we are stuck in a corner.  The homeowner has the funds and is being unresponsive to calls and letters being sent.  The insco won't reissue and even if they do they will send them to the homeowner."  (*Id*. at WF000436.)

Initially Ms. Copeland misread Ms. Gillis' file, leading her to believe that the insurance proceeds represented only 35% of the unpaid balance (or "UPB") of the loan.  Once Ms. Copeland realized that the proceeds represented approximately 70% of the unpaid balance, she completed a "corporate proposal" to determine what action Wells Fargo should recommend to the investor, Fannie Mae.  (Pl.'s Mot. Ex. 2 at 40-43.)  This led her to recommend that the loan be charged off in exchange for the insurance proceeds.  (*Id*. at 43.)

Ms. Copeland therefore sent an email to Fannie Mae's Hazard Loss Division on December 30, 2009, which read: "Attached is the requested 176 form, screen shot of the payoff amount and the bpo [Buyer's Price Opinion].  Please let me know when you have come to a conclusion."  (Pl.'s Resp. Ex. 1.)  On December 31, 2009, Ms. Copeland received an email from Fannie Mae stating:

> Lauren.  The "as is" value per the BPO is $2900 for this Detroit property.  Reduce the UPB by the amount of the insurance proceeds of $70,547.91 and submit the remaining balance for charge off consideration.  Thanks.

(*Id*.)  Ms. Copeland recorded the contents of the email into the Wells Fargo system log.

(Pl.'s Mot. Ex. 3 at WF000594.)  A January 8, 2010 internal entry notes that "Investor

FNMA might use funds to PIF [pay in full] loan and then charge off the remainder."

(Def.'s Resp. Ex. 5 at WF000520.)  An entry on January 20, 2010, however, states that

Fannie Mae approved the short payoff:

> I received the approval from Fannie Mae to apply the funds to
> the UPB and short pay, just as the h/o was wanting to do.  We
> cannot do so until we have the funds.  Can we reach out to the
> borrower and advise them of this.

(Pl.'s Mot. Ex. 3 at WF000521.)  Entries on January 26 and 27, 2010, reflect similar

information and messages left for Ms. Gillis on her answering machine.  (*Id*.)

On January 28, 2010, Ms. Gillis called Wells Fargo and was advised of the short

payoff approval.  (*Id*. at WF000522.)  When she inquired as to what happens after she

sends in the insurance check, she was directed to Wells Fargo's Loss Mitigation

Department to get details concerning the short pay.  (*Id*.)  Wells Fargo's system log

reflects several additional calls from Ms. Gillis inquiring about the short pay process,

where she was advised that the short pay was approved.  (*Id*. WF000522-23.)  On

February 2, 2010, Ms. Gillis was told to submit her questions concerning the short pay in

writing.  (*Id*. at WF000523.)

On the same date, Ms. Gillis faxed a letter to Wells Fargo setting forth her

questions concerning the short pay process.  (*See id*. at WF000523.)  Six days later, on

February 8, 2010, Ms. Gillis again contacted Wells Fargo "to discuss her concerns before

she will submit the claim check."  (*Id*.)  On or about February 16, 2010, Ms. Copeland

sent Ms. Gillis a letter via overnight mail responding to the questions in the latter's

February 2 letter.  (*Id.* at WF000525; Ex. 4.)  Ms. Copeland's letter reads:

> Maureen,
>
> This letter is to answer any questions you may have on the short payoff
> process.
>
> 1. What does it mean to short pay a loan?
>     A. The investor accepts funds as satisfaction of the debt.  Basically
> they are accepting your insurance funds and they will call this satisfaction
> of the mortgage debt.
> 2. Who owns the home after the transaction?
>     B. The lien will be released and you will own the property.  To
> obtain the lien papers you can go to the county and they can provide this.
> 3. Is there a time frame for when I need to have everything out of the
> house?
>     C. No, because the lien is released, you own the property.
> 4. Should I overnight the check and to whom do I send it to?
>     D. You can overnight the check to the Loss Draft group you were following
> up with.
>     WFB
>     Attn Property Loss
>     One Assurant Way
>     Springfield, OH 45505
>
> If you have any questions, feel free to call or email me.  Thanks.

(*Id.* Ex. 4.)  The letter is signed by Ms. Copeland, followed by her printed name,

department, Wells Fargo's name, and her contact information.  (*Id.*)

On February 17, Ms. Gillis contacted Wells Fargo to convey that a new (i.e.

unstale) check was being sent to her from the insurance company and that she would

forward the check to Wells Fargo's Loss Draft Department.  (Pl.'s Mot. Ex. 3 at

WF000525.)  Ms. Gillis thereafter endorsed Farmer's check for the insurance proceeds

and sent it to Wells Fargo via overnight mail.  Wells Fargo received the check on

February 26, 2010, and forwarded it to National City Home Equity for endorsement.  (*Id.*

at WF000526.)

> On March 10, 2010, Ms. Copeland sent an email to Ms. Gillis stating:

> Hi Maureen, Our check lady said National City Home Equity received the
> check and is going to endorse it and send it back in to us.  She said we'll
> receive it at the latest, Friday.  Once this is received, I'll start the short pay
> process and once that is completed, which only takes a few days or a week
> at the most, I'll call you and let you know that the process is completed.  I
> understand you feel a bit anxious but we received Fannie Mae's approval
> for the short payoff so the hardest part is already completed.

(Pl.'s Mot. Ex. 5.)  Two days later, Ms. Copeland sent another email to Ms. Gillis stating

that Wells Fargo received the check back with National City's endorsement and that she

would be starting the short pay process on Monday.  (*Id.*)  On the same date, however,

Wells Fargo sent Ms. Gillis a letter advising her in part that the insurance proceeds "will

be utilized to repair the damage to the property or to reduce the balance of [the] loan."

(*Id.* Ex. 6.)  Notes in Wells Fargo's internal log, however, reflect that "this was a short

pay approved by Fannie Mae" and that the proceeds should be deposited and the loan

"short paid" or "charge[d] off."  (Pl.'s Mot. Ex. 3 at WF000529.)  Ms. Gillis attempted to

contact Ms. Copeland inquiring about the inconsistent information she was receiving (*see

id.* Ex. 5), but got no immediate response.

> Finally, on June 2, 2012, Ms. Copeland informed Ms. Gillis in an email that

Fannie Mae had "stopped all charge offs for review" and that Wells Fargo had applied the

insurance proceeds to the total balance of the mortgage.  (*Id.*)  Ms. Copeland further

wrote, however, that "[t]he insurance proceeds have been applied to the loan and all that is left is the remainder to be charged off."  (*Id.*)  Ms. Gillis wrote to Ms. Copeland on June 26, 2010, inquiring if there was anything that either of them could do to move the process along because Ms. Gillis "had some people ask about purchasing the house" but needed the paperwork to come through first.  (*Id.*)  Ms. Copeland advised Ms. Gillis in response that Fannie Mae was in a "charge off moratorium" and that she should contact Wells Fargo's Loss Mitigation Department to look into setting up a "short sale."  (*Id.*)

Ms. Gillis continued to ask about the status of the short pay.  Eventually, on July 14, 2010, Ms. Copeland wrote another Wells Fargo employee, Kim Buckner, to inquire: "Kim, any updates on this charge off that was previously approved?"  (Pl.'s Mot. Ex. 3 at WF000535.)  Ms. Buckner's response indicated that it in fact had not been approved: "FNMA only approved sending the funds and submitting a request . . . for consideration. The case was entered previously, but is still in review (like most others)."  (*Id.*)

On August 13, 2010, Fannie Mae declined the short payoff.  (*Id.* at WF 000536.) On August 23, Ms. Copeland conveyed this information to Ms. Gillis.  (Pl.'s Mot. Ex. 5.) When Ms. Gillis called Wells Fargo on September 2, 2010, she was informed that her loan was in foreclosure, although the agent recognized that notes for the account in March reflected Fannie Mae's approval of a short payoff.  (*Id.* Ex. 3 at WF000537.)

The Property eventually was sold at a sheriff's sale on November 24, 2010. According to the Sheriff's Deed on Mortgage Sale, Wells Fargo was the highest bidder with a total bid of $45,770.97.  (Def.'s Resp. Ex. 9.)  An affidavit completed by Wells

12

Fargo's representative in compliance with Michigan's foreclosure by advertisement statute indicates that Ms. Gillis needed to pay $45,770.97, plus interest, to redeem the Property and that the redemption period would expire May 24, 2011. (*Id.*) Ms. Gillis failed to redeem and Wells Fargo subsequently conveyed the Property to a third party for $7,612.00 on July 13, 2011. (*Id.* Ex. 10.) Wells Fargo issued Ms. Gillis a 1099-A for 2011, reflecting that the fair market value of the Property was $45,770.97 and that the outstanding principal balance was $99,989.42. (Pl.'s Mot. Ex. 7.)

## III.   Applicable Law and Analysis

As indicated earlier, Ms. Gillis seeks summary judgment with respect to all of the claims in her Complaint. Wells Fargo seeks judgment on the pleadings or summary judgment with respect to Ms. Gillis' fraud and conversion claims.

### A.   Breach of Contract[2]

Ms. Gillis alleges that Wells Fargo breached an agreement to consider the Note paid in full in exchange for the insurance proceeds. Wells Fargo raises several arguments

---

[2]Wells Fargo understands Ms. Gillis to be alleging a breach of the Mortgage, in addition to a breach of the agreement to short pay the loan, because she argues that Wells Fargo used the insurance proceeds in a manner not authorized by the Mortgage. (*See* Def.'s Resp. Br. at 12.) Ms. Gillis makes clear, however, that she is not asserting a breach of contract claim based on the Mortgage and in fact believes that the short payoff agreement replaced that earlier agreement. Rather, Ms. Gillis' argument concerning Wells Fargo's alleged unauthorized use of the insurance proceeds relates to her claim that she was not obligated to turn over the proceeds to Wells Fargo and was only induced to do so by Wells Fargo's representation that, in exchange, she would receive a short payoff of the loan.

as to why it believes Ms. Gillis is not entitled to summary judgment with respect to this claim.

### 1.    Offer, Acceptance, Consideration

First, Wells Fargo contends that the letter from Ms. Copeland to Ms. Gillis concerning the short pay process was not a contract as there was not an offer, acceptance, or consideration.  As to the latter, Wells Fargo maintains that consideration was lacking "because [Ms. Gillis] was already obligated to (i) remit the insurance proceeds to Wells Fargo under the Mortgage, and (ii) repay her loan under the terms of the Note and the Mortgage."  (Def.'s Resp. Br. at 10-11.)

This Court found previously that Ms Gillis presents writings containing all of the material terms of a contract between herself and Wells Fargo, including a representation by Wells Fargo that approval for the short pay had been received from Fannie Mae.  (ECF No. 12 at 12.)  In those writings, Wells Fargo offers to pay off Ms. Gillis' Note in full and give her title to the Property in exchange for the insurance proceeds.  Ms. Gillis undoubtedly accepted the offer by endorsing Farmer's check and sending it to Wells Fargo via overnight mail, in accordance with Wells Fargo's instructions.

With respect to consideration, none is required under Michigan law under the circumstances presented:

> An agreement hereafter made to change or modify, or to discharge in whole or in part, any contract, obligation, or lease, or any mortgage or other security interest in personal or real property, shall not be invalid because of the absence of consideration: Provided, That the agreement changing, modifying, or discharging such contract, obligation, lease, mortgage or

> security interest shall not be valid or binding unless it shall be in writing
> and signed by the party against whom it is sought to enforce the change,
> modification, or discharge.

Mich. Comp. Laws § 566.1.  This Court already has held that the short pay agreement

between Ms. Gillis and Wells Fargo is reflected in a writing, signed by Wells Fargo's

representative, Ms. Copeland.  (ECF No. 12 at 8-12.)  As such, Wells Fargo's lack-of-

consideration argument is without merit.

In any event, contrary to Wells Fargo's assertion, neither the Note nor Mortgage

required Ms. Gillis to remit the insurance proceeds to Wells Fargo under the facts

presented (i.e. where there was an agreement to use the proceeds in a manner other than

to conduct repairs).  (*See* Def.'s Resp. Ex. 1; Ex. 2 § 5.)  Also contrary to Wells Fargo's

assertion, while Ms. Gillis was required to repay the loan, the Note did not require her to

pay it in the manner that she did (i.e. making a lump sum payment of $70,547.91).  (*See*

*id*.)

### 2.    Terms of the Contract

Wells Fargo next argues that, even if a contract existed, there is a question of fact

as to its terms.  Wells Fargo states:

> . . . Wells Fargo disputes that the terms of the contract are set forth in the
> February 17, 2010 letter.  Instead, the evidence shows that Wells Fargo
> repeatedly advised Plaintiff that the insurance proceeds were needed and
> that they would be applied to pay the Loan balance down.  Further, Plaintiff
> knew that Fannie Mae's approval was required, and she knew that the
> process did not even begin until Wells Fargo received the insurance
> proceeds.

(Def.'s Resp. Br. at 11.)

In this argument, Wells Fargo fails to distinguish between what it initially told Ms. Gillis and her representative and what it eventually said once it decided a short pay was an option with respect to her loan. The evidence does show that Wells Fargo told Ms. Gillis and/or her representative that the insurance proceeds would be used to pay down the loan, only, and that Fannie Mae approval was required to short pay the loan instead. Notably, when Wells Fargo offered to accept the insurance proceeds to pay down the loan, Ms. Gillis rejected that offer and refused to send in the insurance check. Later, however, Ms. Gillis was told– and a written contract was entered stating– that the proceeds would be applied to completely satisfy the debt *and* that Fannie Mae approval *had been obtained*.[3]  Additionally, while Wells Fargo points to evidence showing that Ms. Gillis was informed that the short pay "process" could not be completed until it received the insurance check, this did not advise her that there was no *agreement* to short pay the loan until it received the insurance proceeds.

### 3.    Initial Breach

Finally, Wells Fargo asserts that Ms. Gillis has no right to enforce the terms of the Mortgage because she committed the first material breach by failing to pay the debt evidenced in the Note, failing to remit the insurance proceeds to Wells Fargo to hold

---

[3]To the extent Wells Fargo's internal notes continue to reflect that the proceeds only would be used to pay down the balance or that Fannie Mae approval had not yet been obtained and/or could not be obtained until Ms. Gillis tendered the insurance check, there is no evidence that this information was ever communicated to Ms. Gillis (or her representative) after she was promised the short pay.

during the repair process, and demanding that the insurance proceeds be used as a short payoff rather than to repair the Property.

The Court has found, however, a valid contract between the parties modifying Ms. Gillis' obligations under the Note and Mortgage.  In any event, Wells Fargo's argument that Ms. Gillis breached the earlier contracts has no merit.

First, the express terms of the Mortgage did not require Ms. Gillis to submit the insurance proceeds to Wells Fargo *unless* the Property was being repaired and restored. (Def.'s Resp. Ex. 2 ¶ 5.)  The Mortgage did not require that the Property be repaired and restored.  It plainly states that the lender and borrower could agree in writing to use the proceeds otherwise.  (*Id*.)  As to how they could agree to use the proceeds, neither the Mortgage nor Note precluded Ms. Gillis from "demand[ing]" (as Wells Fargo characterizes her request) that the insurance proceeds be used as a short payoff, just as neither contract precluded Wells Fargo from rejecting Ms. Gillis' "demand."  The evidence shows, however, that Wells Fargo eventually determined that it should consent to her request and accept the insurance proceeds to short pay the loan.  As such, Ms. Gillis did not commit the first material breach of any agreement between the parties.

For these reasons, the Court finds that Wells Fargo fails to create an issue of fact with respect to Ms. Gillis' breach of contract claim.  Ms. Gillis therefore is entitled to summary judgment with respect to this claim, Count 5 of her Complaint.

### B.    Conversion

Ms. Gillis alleges that Wells Fargo's use of the insurance proceeds to pay down

17

the loan rather than to pay it off completely constituted conversion in violation of the

common law and Michigan Compiled Laws Section 600.2919a.  Conversion is defined,

for common law and statutory purposes, as "any distinct act of domain wrongfully

exerted over another's personal property in denial of or inconsistent with the rights

therein."  *Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 636-37 (6th

Cir. 2001) (citing *Sarver v. Detroit Edison Co.*, 225 Mich. App. 580, 585, 571 N.W.2d

759, 761 (1997)), abrogated on other grounds by *Reed Elsevier, Inc. v. Muchnick*, 559

U.S. 154, 130 S. Ct. 1237 (2010); *see also Victory Estates LLC v. NPB Mortg. LLC*, No.

307457, 2012 WL 6913826, at *2 (Mich. App. Nov. 20, 2012) (concluding that the

common-law definition defines both common-law and statutory conversion under

Michigan law).  Wells Fargo argues that Ms. Gillis' conversion claim fails because the

insurance proceeds belonged to her *and* Wells Fargo and because Wells Fargo used the

proceeds in an authorized manner.  Wells Fargo also argues that the "economic loss

doctrine" precludes this claim and that this claim, as well as Ms. Gillis' fraud claim, fail

because Wells Fargo did not owe her a duty or care separate and distinct from its

contractual obligations.

### 1.     Use of Joint Property

This Court addressed Wells Fargo's "joint property" argument in part in its

opinion and order denying Wells Fargo's motion to dismiss.  (*See* ECF No. 12 at 16-17.)

As the Court explained there, while "a person cannot convert his own property . . .

conversion may occur when a party properly in possession of property uses it in an

18

improper way, for an improper purpose, or by delivering it without authorization to a third party.  (*Id.* at 17, internal quotation marks and citations omitted.)  Thus Ms. Gillis' conversion claim turns on whether Wells Fargo used the insurance proceeds for an unauthorized purpose.

Wells Fargo argues it used the insurance proceeds for an authorized purpose and with the consent of Ms. Gillis.  First, Wells Fargo contends that as mortgagee under the standard mortgage clause and as an additional loss payee on the check, it had rights to the insurance proceeds to the extent of its interest (i.e., $104,000.00).  Second, Wells Fargo argues that it did not convert the proceeds to its use but rather "to pay-down ***Plaintiff's*** Loan balance and to satisfy a portion of ***Plaintiff's*** debt obligation."  (Def.'s Resp. Br. at 15 (emphasis in original).)  Finally, Wells Fargo maintains that it obtained the check with Ms. Gillis' consent.

As set forth in the background section, the Mortgage contains a specific provision addressing the use of such insurance proceeds:

> *Unless Lender and Borrower otherwise agree in writing*, any insurance proceeds, whether or not the underlying insurance was required by Lender, *shall be applied to* restoration or repair of the Property, *if* the restoration or repair is economically feasible and Lender's security is not lessened. . . . *If* the restoration or repair is *not* economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any paid to Borrower.  . . .

(Def.'s Resp. Ex. 2 ¶ 5 (emphasis added).)  Thus Wells Fargo only had the authority to apply the insurance proceeds to the unpaid principal balance *if* repair or restoration of the

19

Property was not economically feasible or its security would be lessened *and* the parties did not agree to a different use.

While Wells Fargo demonstrates that Ms. Gillis wanted to use the proceeds to short pay the loan rather than repair the Property, it fails to present evidence to show that repair or restoration "was not economically feasible" or that its security would be "lessened."[4]  More significantly, the evidence establishes that Ms. Gillis and Wells Fargo "agree[d] in writing" that the insurance proceeds would be used in another manner, i.e., to short pay the loan.  It was this agreement that controlled how Wells Fargo was authorized to use the parties' joint property.  While Wells Fargo did obtain the insurance proceeds with Ms. Gillis' consent, she only consented to their use in accordance with the short pay agreement.  As noted in this Court's June 25, 2012 decision denying Wells Fargo's motion to dismiss, "[c]onsent is only effective within the scope given and it is not effective if it was obtained through fraud."  (ECF No. 12 at 18 n.5.)

For these reasons, even though the insurance proceeds also belonged to Wells Fargo, the Court finds that it used the proceeds in an unauthorized manner and without Ms. Gillis' consent.

### 2.   Economic Loss Doctrine

_____

[4]Wells Fargo contends that Ms. Gillis "refused" to repair the Property.  The evidence reflects that she did not "want" to repair it and, instead, preferred to use the proceeds for a short pay.  There is nothing in the record to indicate that she ultimately would have refused to repair the Property if Wells Fargo continued to reject her requests for the short pay.

20

Wells Fargo also argues that Ms. Gillis' conversion claim is precluded by the economic loss doctrine as the parties' relationship is governed by a contract.  Wells Fargo raised the same argument in its earlier motion to dismiss, and the Court rejected it because Ms. Gillis did not necessarily suffer only economic losses as a result of Wells Fargo's alleged misconduct.  (ECF No. 12 at 18-19.)  The Court now rejects Wells Fargo's argument for the additional reason that this case does not involve the commercial sale of goods.  *See Quest Diagnostics, Inc. v. MCI Worldcom, Inc.*, 254 Mich. App. 372, 376-78, 656 N.W.2d 858, 861-62 (2002) (summarizing the Michigan courts' application of the doctrine); *see also Neibarger v. Universal Coop., Inc.*, 439 Mich. 512, 515, 486 N.W.2d 612, 613 (1992) (explaining that the economic loss doctrine "bars tort recovery and limits remedies to those available under the Uniform Commercial Code where a claim for damages arises out of the commercial sale of goods and losses incurred are purely economic.").

### 3.    Separate Duty

Finally, Wells Fargo argues that Ms. Gillis' tort claims must be dismissed because it did not owe her a duty of care separate and distinct from its contractual obligations. (*See* Def.'s Br. in Supp. of Mot. at 21.)  Because the Court concludes that Wells Fargo in fact owed Ms. Gillis duties beyond its contractual obligations– those being the duty not to deceive her and the duty not to exercise wrongful domain over her property– it rejects this argument.

For these reasons, the Court concludes that Ms. Gillis is entitled to summary

21

judgment with respect to her conversion claim, Count 1 of her Complaint.

### C.    Fraud

Both parties seek summary judgment with respect to Ms. Gillis' fraud claims.[5]  A

claim of fraud requires proof of the following:

> (1) That [the] defendant made a material representation;[6] (2) that it was
> false; (3) that when [the defendant] made it he knew that it was false, or
> made it recklessly, without any knowledge of its truth, and as a positive
> assertion; (4) that he made it with the intention that it should be acted upon
> by [the] plaintiff; (5) that [the] plaintiff acted in reliance upon it; and (6)
> that he thereby suffered injury.

*Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813, 816

(1976).

Wells Fargo argues that Ms. Gillis' fraud claims fail because it accurately

represented to her that the short pay had been approved based on Fannie Mae's email,

even though Fannie Mae subsequently changed its mind after Ms. Gillis submitted the

insurance check.  Wells Fargo points out that it informed Ms. Gillis throughout their

---

[5]In her motion, Ms. Gillis focuses exclusively on her fraud claim (Count 2) rather than her negligent misrepresentation or innocent misrepresentation claims (Counts 3 and 4, respectively.)  Wells Fargo argues that all of these claims fail for the same reason. Thus the Court's analysis of Ms. Gillis' fraud claim applies to all of her misrepresentation claims for purposes of ruling on Wells Fargo's motion.

[6]In its pleadings, Wells Fargo continuously misquotes this first element by stating that the defendant must have "made a material *mis*representation."  (Def.'s Resp. Br. at 17, emphasis added; Def.'s Br. in Supp. of Mot. at 18, emphasis added.)  But the second requirement– which Wells Fargo also includes in its recitation of the elements– is that the defendant's representation was false.  The Court does not know what it would mean for a "misrepresentation" to be "false."  To the extent it means the representation is true, this clearly does not state a "fraud" claim.

communications that it needed the insurance check before the short pay process could

begin.  Alternatively, Wells Fargo argues that Ms. Gillis cannot show reasonable reliance

on its alleged misrepresentation because, it claims, she already was obligated under the

Mortgage to send the insurance proceeds to Wells Fargo.  According to Wells Fargo,

"Plaintiff acknowledges that there was no authority for her to do what she did– withhold

the insurance proceeds and attempt to negotiate a deal with Wells Fargo."  (Def.'s Br. in

Supp. of Mot. at 19.)  The Court already addressed and rejected Wells Fargo's assertion

that Ms. Gillis was not authorized to hold the insurance proceeds and attempt to negotiate

a short payoff when ruling on Ms. Gillis' breach of contract and conversion claims.  It

therefore also rejects Wells Fargo's "reasonable reliance" argument.

### 1.    Misrepresentation

Wells Fargo now contends that Fannie Mae approved the short pay request but,

after Ms. Gillis endorsed and submitted the insurance check, changed its mind and

rejected it.[7]  Wells Fargo relies on Ms. Copeland's assertion at her deposition testimony

that she understood the December 31, 2009 email she received from Fannie Mae as

reflecting its approval of the short pay, even though the email stated: "Lauren.  The 'as is'

value per the BPO is $2900.00 for this Detroit property.  Reduce the UPB by the amount

of the insurance proceeds of $70,547.91 and submit the remaining balance for charge off

---

[7]Earlier in this litigation, Wells Fargo took the position that Fannie Mae never approved the short pay and only would consider the request after receiving the insurance check.

*consideration*." (Def.'s Resp. Ex. 5 at WF000634, emphasis added.)

During her deposition, Ms. Copeland was insistent that the wording used by Fannie Mae in the above email is the wording used for short pay approval. (Def.'s Mot. Ex. 7 at 116-18, 120-21, 127-28.) Ms. Gillis presents substantial evidence that raises questions concerning Ms. Copeland's credibility and the accuracy of her interpretation. But " 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts . . . are jury functions, not those of a judge.' " *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 578 (6th Cir. 2013) (quoting *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513). Thus the Court finds a question of fact with respect to whether Wells Fargo's representation to Ms. Gillis was false when made.

As such, the Court concludes that neither party is entitled to summary judgment with respect to Ms. Gillis' fraud or misrepresentation claims, Counts 2 through 4 of her Complaint.

### D.    Damages

#### 1.    For Breach of Contract

As a result of Wells Fargo's breach of the payoff agreement, Ms. Gillis asserts that she is entitled to the " 'benefit-of-the-bargain.' " (Pl.'s Br. in Supp. of Mot. at 11, quoting *Giordina v. Markovitz*, 209 Mich. App. 676, 681, 531 N.W.2d 815 (1995).) That benefit, she argues, was title to the Property and the reduction of her $104,793.16 debt upon endorsement and delivery of the $70,547.00 insurance check, in other words, a debt reduction of $34,246.16. (*Id.*) Recognizing that she cannot gain title to the Property– as

24

it was conveyed to a third party after the sheriff's sale and expiration of the redemption period– Ms. Gillis argues that she is entitled to the proceeds from the sheriff's sale, or $45,770.97.  Thus Ms. Gillis seeks damages on her breach of contract claim totaling $80,017.13.

Wells Fargo argues in response that Ms. Gillis is not entitled to recover any monies for the cancellation of the debt.  Wells Fargo also argues that there is a factual dispute concerning the value of the Property as the buyer's price opinion, as stated on December 29, 2009, was $2,750.00 and the Property actually was sold to a third party for only $7,612.00 on July 13, 2011.  Ms. Gillis points out in reply that, in August 2009, Wells Fargo estimated the Property's value to be $120,202.00.  (*See* Pl.'s Mot. Ex. 3 at WF000484.)

Assuming that Wells Fargo is not pursuing Ms. Gillis for balance of the loan, the Court does not believe that she is entitled to damages equal to the amount of the debt she expected to have reduced.  In fact, if Wells Fargo is not pursuing her for the balance, she effectively has had her debt reduced.  She is entitled to damages equal to the value of the Property.  The Court, however, finds that there is an issue of fact with respect to its value.

### 2.    For Conversion

Ms. Gillis seeks damages on her conversion claims equal to the actual or fair market value of the property converted (i.e., the check or $70,547.00) at the time of conversion, as well as treble damages as allowed under Michigan's conversion statute, Mich. Comp. Laws § 600.2919a(1).  (Pl.'s Br. in Supp. of Mot. at 15, citing *Hudson v.*

25

*Enichen*, 308 Mich. 79, 85, 13 N.W.2d 215 (1944) and *Larson v. Van Horn*, 110 Mich.

App. 369, 385, 313 N.W.2d 288 (1981).)  Ms. Gillis argues that Wells Fargo cannot

mitigate its damages by maintaining that the converted proceeds were applied to reduce

the amount she owed under the Note.  (*Id*., citing *Northrup v. McGill*, 27 Mich. 234, 240

(1873) and *Walters v. Alden State Bank*, 155 Mich. App. 29, 38 (1986); *see also id*. at 16,

citing *Alken-Ziegler, Inc. v. Hague*, 283 Mich. App. 99 (2009).)

      Wells Fargo argues that Ms. Gillis' conversion damages are not measured by the

value of the insurance check but her actual damages.  Because "Wells Fargo's interest in

the insurance proceeds exceeded [Ms. Gillis'] interest and because the insurance proceeds

were applied to [her] account" (Def.'s Resp. Br. at 20), Wells Fargo argues that her actual

damages are $0.  (*Id*.)

      The Court is not persuaded by either parties' arguments at this time.  Because the

Court finds an issue of fact with respect to Ms. Gillis' fraud claim and with respect to

damages for her breach of contract claim, it finds it unnecessary to decide at this time

how much she also is entitled to under the conversion claim.

### IV.    Conclusion

      For the reasons set forth above, the Court holds that Ms. Gillis is entitled to

summary judgment with respect to her breach of contract and conversion claims (Counts I

and 5, respectively).  The Court, however, finds a genuine issue of material fact

precluding summary judgment with respect to her fraud claims (Counts 2-4).  Wells

Fargo is not entitled to judgment on the pleadings or summary judgment with respect to

Ms. Gillis' conversion or fraud claims, as it requests.

The Court finds a genuine issue of fact with respect to the damages Wells Fargo must pay Ms. Gillis for breaching the short pay agreement.  The Court reserves ruling on the amount of damages she is entitled to under her conversion claim.  Because the Court does not grant summary judgment to Ms. Gillis on any of her misrepresentation claims, it declines to address her request for damages with respect to those claims now.

Accordingly,

**IT IS ORDERED**, that Defendant Wells Fargo Bank N.A.'s motion for judgment on the pleadings and/or motion for summary judgment is **DENIED**;

**IT IS FURTHER ORDERED**, that Plaintiff Maureen Gillis' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.


Dated: May 22, 2013                          s/PATRICK J. DUGGAN
                                             UNITED STATES DISTRICT JUDGE

Copies to:
Kevin Ernst, Esq.
Dean Elliott, Esq.
Lori McAllister, Esq.
Michael J. Blalock, Esq.
Brandon M. Blazo, Esq.

27